Good morning, Your Honors. My name is Maurice Wehner. In this case, I represent the appellant, Philips BTS. Let me say before I get started that I think this case involves some of the most sophisticated bankruptcy lawyering that I've seen in my 20 years of practicing law. And I hope that you will listen to the argument with that in light. We're dealing with some of the most prestigious firms in the city, and we're also dealing with some of the wealthiest companies in our country, mostly banks. It is an undisputed fact in this case that this is a solvent estate, but for the deficiency claim of the banks. The banks claim that they have a deficiency claim of $60 million or $49 million, somewhere in that range. I can't even imagine what that looks like. And I'm here today to try to convince you that the court should have, in response to our motion, in response to the motion for summary judgment, looked at that claim with some distrust for the purposes of summary judgment. My job today is to convince you that what the court did was weigh the evidence in response to the summary judgment, rather than saying that we had overcome the presumption of insolvency. Now, if you look at this case at first blush, the obvious question and the elephant in the room is, well, the banks have a claim for $60 million. Why are they different than anybody else? Why should they be treated differently than anybody else? And I think I have five reasons why the banks do not have a $60 million deficiency claim. And let me give them to you. But before I give them to you, there's two dates that I wish you to keep in mind. I wish you to keep in mind the date that the asset sale closed. In this case, I'm not sure that the evidence is that clear. It's either March 2nd or March 10th of the year 2000. The date of the bankruptcy was April 6th, 2000. Plus or minus, give or take, 20, 25 days. 25 days after all of the unsecured, nearly all of the unsecured creditors get paid, this debtor files a bankruptcy. Now, I'm hoping that your honors will ask the question, if the banks consented to the sale because they were secured creditors, and nearly all of the unsecured creditors got paid, and there's enough money in this estate to pay all unsecured creditors, why was there a need for a bankruptcy 20 days after an asset purchase sale? Reason number one. When the buyer bought the assets, one of the items that the buyer bought was goodwill. The buyer was insistent upon maintaining the goodwill of the vendors in the industry with which it also did business. The buyer was unwilling to consummate the sale of all of the assets of this debtor unless and until certain creditors were paid. Vitek, the buyer, paid a higher value for these assets because it was buying the goodwill of the business. And that is established by the declaration, or the deposition rather, of Carlos De Matos, which is in Exhibit 6 in the record, page 267. Now, what does that have to do with anything? Well, if Vitek paid a higher price because the unsecured creditors were being paid, that additional value inured to the banks that held the veto power over the sale. Now, why did I say the banks had a veto power? Because they did. Reason number two. The banks had a security interest, as is typical in lending arrangements, over all of the assets of these debtors. The banks had to specifically consent to the sale and had to consent to the terms of the sale. Reason number two. The banks cannot have a claim they consented to the release of their security interest and the terms of the sale. This is established by Exhibit 13, page 753. Now, what's also important is, if you look at the totality of the record, is that I tried throughout the litigation to obtain the actual consent of the bank, which is supposed to be Schedule E to the Asset Purchase Agreement. And I tried to get that both from the plaintiff, in this case the trustee. I tried to get it from the bank's counsel's lawyer. And I believe I also tried to get it from the seller's lawyer. And if you look at the record at, I believe that it's Exhibit 13, page 753, I write a letter to the lawyer at Kay Scholar's office, asking him for a complete copy of the agreement. Now, if you look at the waiver and amendment agreement number six, which is an amendment to the lending agreement between the banks and the debtor, it states in pertinent part as follows. The borrowers have requested, that's the debtors, and the agent and the lenders have agreed that the agent release its security interest in the assets of Duke City sold pursuant to the Asset Purchase Agreement. There is no doubt in this record that the banks consented to the sale. Now, why do I say there's some of the most sophisticated lawyering going on in this case? And here's why. What the banks couldn't do outside of bankruptcy, they hope to do in bankruptcy. They couldn't get Vitek off the ball. Vitek said, we will not buy these assets unless certain creditors get paid. Banks came up with an ingenious scheme through the lawyering. Ingenious. They said, okay, we'll pay you if that's your position. The check goes out on March 2nd to my client. On April 6th, there's a bankruptcy. And now they file preference actions seeking to recover the money that's been paid to my client. That to me is very troubling. Now, it gets even more troubling. It gets more troubling because here's what they do next. Let me ask you this, if this doesn't too disrupt your train of thought. The banks consented to the sale. Did they consent that as part of the sale, the debt would be paid to your client? You know, that's a difficult question to answer because it's, you know, it's a long and subtle doctrine. What the banks do is they consent to the form of the agreement. They say, we consent to allow you to sell the assets based upon the agreement that's under 45 pages long. That's how I understand the consent. However, the actual consent of the bank, which is supposed to be attached, is not attached to the agreement. And nobody has it. I can't find it and I try to get it. Okay. But the 45-page agreement contains within it the specification of the debt that will be paid to your client. That's right. There's a schedule of those that are going to be paid and those that are not going to be paid. Okay. But the short answer is we don't have the actual document that would really nail this down in terms of the consent. But we do know that from the waiver and amendment agreement number six, which is the lending documents, that the banks consent to the terms of the asset purchase agreement, which is what I just read. Is there any explicit or implicit representation by the banks and their consent as to whether Matthews was solvent at the time of the sale? Yes. Okay. And you have to put a bunch of documents together, but here's how it works. There's the lending agreement and a typical bank agreement says, you're coming to us to borrow money. You're representing to us that you're not insolvent, that you're able to pay your bills as they come due in the ordinary course of business, that you have the money to pay us back if you want, that your assets succeed. Those kind of representations. Now, when the waiver and amendment agreement is executed, the last thing the banks want to be involved in is an amendment to their agreement that says that we're going to allow you to sell these assets, but you acknowledge that you're insolvent. So what the bank does is they sign another document, the waiver and amendment agreement number six, which incorporates the representations, reaffirms the representations rather, in the original settlement, in the original lending agreements that there's no insolvency and that the company's healthy. And what date are those documents signed by the bank? I believe we have it in the record. I don't know, but I know the transaction closed on March, so I believe that it's March 2 or March 10, but I'm not certain. I can look it up. Okay. But you're arguing then that the bank is thereby incorporating the statement from January 21st of solvency? No. As part of the amendment to the loan agreement, which allows the asset purchase sale, the debtor has to reaffirm his solvency. And at what point does the debtor reaffirm his solvency? As I think from the banks stating something. Well, again, the last one and the most important one is on March 10th, which is the certificate filed by the chief financial officer, Carlos De Matos, who we've spoken about, which is at Exhibit 13, which is at 745, which says that he, Carlos De Matos, the chief financial officer of all of these. Well, let me explain it to you this way. The asset purchase agreement, the waiver and amendment agreement and the consent of the bank requires the bank to receive from the chief financial officer, this is at page 1009, that immediately after giving effect to the transactions, that's the asset purchase agreement, contemplated herein all representations and warranties contained in the agreement or otherwise made in writing to the agent, which is the banks, in connection herewith shall be true and correct. And after giving effect to the transactions contemplated herein, there exists no unwaived default or event of default. And after giving effect to the transactions contemplated herein, September 30, 1999, no event has occurred which would result in a material adverse effect. And you sort of have to relate that paragraph back to the lending agreements where there's affirmations of solvency and ability to pay and financial solvency. I think that answers your question. I hope it does. Okay. Well, you did your best. That language is a little opaque. Now, let me tell you why what really, really, really bothers me and what I think should really bother you. The concept of bankruptcy is equality of distribution or equality of pain. Certain people in bankruptcy don't get paid back and everybody's supposed to share in that pain. And here's where I find the telltale sign of the games that the bank is trying to pull. After bankruptcy's filed, there's an unsecured creditors committee that's put together and they have some meetings about the bank's claim and they enter into an agreement to allow the bank to have a $49 or a $60 million deficiency claim. What's troubling about that agreement is that there are 12 debtors, 12 entities that file for bankruptcy. Eleven debtors, 11 of those debtors, creditors, are never sued for preference recovery. By agreement with the bank, the bank signs onto an agreement and makes it a material condition to the settlement that the trustee will never sue the 11 entities' creditors that received preferential payments. The only ones they're going to go after are the Duke City creditors, the ones that received the money in the asset purchase sale. Now, if that doesn't trouble your honors and that doesn't violate the fundamental, basic values of bankruptcy, I would be concerned because I don't see a rational reason why anybody would make that agreement unless this was a scheme to create a preference. The settlement's very purpose is to create a preference. Now, explain what you mean, a scheme to create a preference. You're saying that there are 12 preferences out there. They made an agreement that they would not or they required an agreement out of the trustee that the trustee would sue only one of them. Am I understanding you correctly? Right. But you didn't – but how does that create a preference? You say there are 12 preferences, only one of which they're going to sue on. The premise of your statement is that there are 12 that have already been created. There are already preferences. I say there was a scheme to create a preference here for two reasons. One, on March 10th, when this agreement was closed, they knew – the banks knew that the debt that the buyer was insisting that certain creditors be paid. Right. Twenty days later, there's a bankruptcy. Right. Everybody's been – nearly everybody's been paid, and there's money to pay everybody except for the bank's deficiency claims. Now what they do is they go one step further. Now, if my clients – bring it back up. This debtor, because it's a co-guarantor of a loan where there's 12 people, has rights of contribution and subrogation that the bankruptcy court said are nearly incomprehensible. I just don't think she understood what I was trying to say, so let me try it with your honours, and maybe I'll have more success. If you and your friend go out and you borrow money from a bank, and ultimately you have to pay the bank back, you're both co-guarantors, you have the right to seek a contribution from your friend. In this case, there's 12 bankruptcy entities. As part of the settlement agreement, would it shock you to learn that the 11 other debtor entities are required to waive their contribution rights against Duke City? So now when you do a hypothetical balance sheet analysis, yes, it's true that my client – that the debtor here owes $60 million to the bank, but it can't get $60 million back from these other 11 people that have all let go. That's a scheme to create a preference. There is no rational reason, no logical reason, no intelligent reason why this should occur. This is some of the most sophisticated lawyering in this city in bankruptcy. It violates the very essence of bankruptcy, and I think that it's something – and I ask you why. The question I can't answer for you and the question that I hope to leave you with is why. Why file a bankruptcy after 20 days? Why waive contribution rights? Counsel, you mentioned that the solvency representations, which created an issue, a tribal issue of factors against the statutory presumption, arise from two things. One, the lending agreement. I'll put that to one side. Secondly, the waiver and amendment agreement number six. My notes indicate, and perhaps you can correct me, that the waiver and amendment agreement number six at Excerpt of Record 183-194 was not in evidence before the bankruptcy court. Rather, it was submitted after oral argument and submission of Matthew's motion for summary judgment. Is that true? Is that correct? I would have to check that. I could tell you what I think was submitted afterwards and what I think – Isn't it rather important? It's attached to so many documents, so if you just give me a moment, I think I can answer that question. Because if the debtor reaffirmance of solvency was on the day before the transaction, it doesn't rebut the presumption of insolvency the day of the presumption. You have to be solvent the day of presumption. And if the certificate of Mr. D'Amato's of March the 10th refers to the waiver and amendment agreement number six, which is not in evidence, then that severely undercuts your argument, I would think. Well, again, I think – It's very difficult to argue that there's evidence in the record to rebut the presumption when that evidence is not in the record. Well, again, Your Honor, I think the waiver and amendment may have been produced by – if the waiver and amendment agreement may have been produced at a later date, I'm not certain about that as I stand here. But what I do know that was produced was a certificate of the chief financial officer under oath dated as of the time of the transaction, which attests to the financial solvency of the entity. Now, the judge seems to just say, well, that's not enough because we know that the transfer occurred on March 2nd. But on March 10th when Mr. Anil Sharma attests to the financial solvency and when Mr. Carlos D'Amato attests to the financial solvency, that's nothing more than a statement. Well, it is something more than a statement. It's a certification under oath as part of the transaction required by the banks. Now, did I hope to have all the evidence at the most summary judgment? The answer is yes. Could I have had more? Yes. Was the consent part of the asset purchase agreement that should have been produced? The answer is yes. Was it produced? No, it was not produced. Has anybody produced it to me to date? Nobody has produced it to me to date. I did the best that I could. The consent of the bank should have been part of the record. But because nobody has it or nobody has been willing to give it to me, as much as I tried, I don't have that. Okay. Why don't we hear from the other side? Your time is about to run on you, but I'd like to save a minute or so for you for rebuttal. Thank you, Your Honor. Good morning. May it please the Court. I'm Judith Seeds Miller, and I'm representing Matthews Studio Equipment Group and Duke City Video, the appellees. And if I could clarify something that was stated earlier, I can point out that in Volume 1 of the excerpts of record, at page 183, is a submission of that subsequent consent waiver and release agreement. And the document referred to as Amendment Agreement Number 6, and that was attached to the ex parte application to supplement the opposition to Motion for Summary Judgment that was submitted to the Bankruptcy Court two months after our oral argument, which occurred in October. So it was not before the Bankruptcy Court when the Gansky Court made its decision, and the Bankruptcy Court did not take a motion for reconsideration with this new evidence, did it? No, it did not. Judge Lax did reference the documents in her decision, but she did not grant the application to supplement the record. So there is nothing putting those documents into evidence. I'd also like to clarify a few things. Counsel has referred to the plaintiff as being the trustee. There is no trustee in this case. Also, it's true that Mr. D'Amato's certification of March the 10th, 2000, was not an affirmation of the representations in the borrowing agreement, but simply a recitation of the Waiver and Amendment Agreement Number 6, and reference to it. Well, I believe that the CFO's certification was reaffirming the statements in the earlier credit documents. Right. So it isn't independent evidence of the solvency of the debtor. No, it's not independent evidence. And as I'll explain, we don't believe it's evidence at all. What has been happening throughout this avoidance action is that Phillips has attempted and the court has seen it this morning, has attempted to litigate the administration of these bankruptcy estates and not litigate what's before the court, which is a preference action. This is a very simple case that's worth a lot of money. With pre- and post-judgment interest, this one transfer exceeds over a million dollars, and that's what's really at issue here. The only issue before the court today is whether the loan representation in the asset purchase agreement was sufficient to rebut the presumption of insolvency, that the debtor was insolvent on the date of transfer. And that's another thing I would like to reinforce, and that is that the only date that is of concern today is whether the debtor was insolvent on the date of transfer. Well, it doesn't have to rebut the presumption. For purpose of motion summary judgment, it simply has to conflict with it sufficiently to raise a triable issue of HAC as against the presumption, right? Yes, Your Honor. Exactly. To rise to the level that the court could say, well, this could go either way. Let's set this for trial. On the issue of whether they were solvent or not on March the 3rd or 2nd, 2000. March 2nd, 2000. March 2nd, right? Yes, Your Honor. And Phillips has also argued that the bankruptcy court improperly weighed the evidence when she determined that the representation of solvency in the asset purchase agreement was insufficient to ship the burden back to the plaintiff. And this argument is flawed for several reasons. First of all, Phillips' reading of Anderson's Unity Lobby Incorporated is not based on the case itself. Phillips is focused on a portion of one sentence in Anderson which states that, quote, the judge is not himself to weigh the evidence and determine the truth of the matter. The remainder of that sentence, however, charges the judge with the duty to determine whether there's a genuine issue for trial. Now, of course, the judge has to weigh the evidence in some manner or there's no function, there's no purpose to having a judge there at all. The two tasks that the Supreme Court set forth in that case for the judge and which it distinguished are determining the truth of the matter proposed by the evidence and determining whether the evidence rises to the level of being significantly probative to create an issue that could be decided either way. And if not, summary judgment should be granted. There must be an issue as to a material fact. Now, we're all in agreement that solvency on the date of transfer is a material fact. The question is whether the representation, the mere representation of solvency in the asset purchase agreement creates a genuine factual issue that can only be resolved by a finder of fact because it could be reasonably resolved either way. What Judge Lacks found was squarely within these parameters. She found three reasons in the face of which the representation did not create a genuine issue which could be resolved either way. One, the statement is hearsay and there was no corroborating evidence. Two, the representation was made 40 days prior on, I believe, January 21, 2000, and the transfer was March 2, 2000. And three, the bank group's pre-petition deficiency claim in excess of $49 million rendered the mere assertion of solvency meaningless. By the way, Phillips did not offer any evidence in support of this representation despite the passage of more than one year from the inception of the action to the summary judgment. The complaint was filed in July, I believe July 31, 2001. The summary judgment motion wasn't heard until October of 2002. Here, in complete accordance with Anderson, Judge Lacks found that the evidence was so one-sided, the estate must prevail as a matter of law. So what would have been sufficient to rebut the presumption of insolvency or at least to create a genuine issue of material fact? Phillips has cited this Court's decision in Corbulus, and we agree that that's the relevant case, but it's not lived up to the standard that's set forth in that case, that insolvency can only be rebutted by real evidence, not a speculative showing. The representation of solvency in the asset purchase agreement is a speculative showing. In Corbulus, the defendant showed the Court how the debtor's own schedules showed or supported a finding of solvency. He showed the Court actual documents which appeared to establish solvency. That was something concrete that the Court could evaluate. A mere representation of solvency in a sales agreement does not establish anything. And as a threshold matter, the representation is hearsay. But Phillips asserts that the estate never raised this issue. That was my next question. And that the Court raised it sua sponte. But the record, Volume 2, page 406, our reply brief before the bankruptcy court, very clearly contains our hearsay objection. I will say that in the two hours... Was that reply brief filed before the evidence came in? No. Well, we filed the asset purchase agreement in conjunction with our motion, but not for the truth of the matter asserted as background information. In their opposition, Phillips raised the issue that the insolvency representation rebutted the presumption of insolvency. And in our reply to that opposition, we said, that statement cannot be offered for the truth of the matter asserted. So your objection per the reply brief was made chronologically before the matter was submitted? Oh, absolutely, Your Honor, absolutely. And then there was discussion at oral argument. Now, I will say at oral argument, Judge Lass did raise it before I ever got to go to the podium. So, yes. But I wouldn't say it was necessarily a sui sumante. But at oral argument, that was after your reply brief had been filed? Absolutely, Your Honor. What if any hearsay exception was urged for the admission of this self-serving declaration not under oath, offer for the truth of the matter asserted? Well, Phillips argued that it was an admission against interest. But there are several reasons why, pursuant to Federal Rule of Evidence 801. But there are a couple of reasons why that's just not so. First of all, Rule 801 requires that the statement be made by that party and that it now be used against the party that made the statement. Here, the representation was made by the pre-petition entity and was being offered against the debtor in possession. That's not the same entity. Pursuant to 11 U.S.C. 1106 A.2.3, a debtor in possession is comparable to a trustee. And a trustee is not bound by the admission of a pre-petition debtor. And I'm unaware of a Ninth Circuit case on this point. However, we did cite the court to a Sixth Circuit decision, Calhoun, which is at page 14 of our brief on appeal. But, Your Honors, even assuming that the arguendo, that this statement is not hearsay, the representation was made on January 21, 2000, and the transfer was made 40 days later on March 2, 2000. Second, Phillips is now arguing for the first time that there's a certification by the debtor's CFO reaffirming the earlier representation. Now, this certification was first attached to page 89 of Phillips' opposition to the motion for summary judgment. But there was no reference made to it in their opposition. And the court can find that at volume 2, page 587 of the excerpts of record. The entire discussion of insolvency in their opposition can be found at pages 501 to 503 of the record. And the only reference is to the representation of solvency in the asset purchase agreement. It was also not mentioned in Phillips' response to plaintiff's statement of uncontroverted facts and conclusions of law. Again, Phillips only referenced section 4.26 of the asset purchase agreement, and that's pages 659 to 662 of the record. And finally, it was never raised in our very lengthy two-hour oral argument before the bankruptcy court on the motion for summary judgment. And it was not raised in appeal to the district court. Phillips is now also asking the court to consider the representations in the consent, waiver, and release agreement, which we've already discussed this morning is not really part of the evidence. But in the event that this court does consider those representations, I'd like to point out that Phillips made no effort to specify to the bankruptcy court what portion of the agreement was significant. In its ex parte application, it simply states, and that's at volume 1, page 35, quote, see exhibit B, sending the court off to peruse 138 pages to try and support Phillips' position regarding solvency. More importantly, though, that section, section 4.17 of the restated credit agreement, which it's saying is being reaffirmed, does not go to this debtor's solvency. And Phillips quoted this at page 8 of its brief. What it is is a representation of the collective solvency of Matthews and all of its subsidiaries. And it adds nothing to rebut a presumption of Duke's insolvency. But, Your Honors, the court really does not need to determine whether Phillips rebutted the presumption because we went far beyond the presumption in making our case. Exhibit 7 to our motion for summary judgment, which can be found at volume 2, page 414, is a copy of the bank group's proof of claim, which was for a claim in excess of $70 million  and this liability arose in April 1st of 1998. Exhibit C to the proof of claim, which can be found at pages 427 and 428 of the record, asserts that it has a perfected security interest in all of Duke's assets. The debtor subsequently acknowledged the validity of the bank group's claim and the amount was actually reduced, but that's really irrelevant because the only date at issue is the pre-petition date of March 2nd, 2000. Yes, 2000. But didn't the bank agree to the sale by Duke to buy tech and therefore waive its security interest in proceeds? No, Your Honor, it didn't waive. I thought I heard Counselor Mr. Weiner say that. I think that I did hear him say that. I don't believe that's true and I don't believe that that was litigated below. In any event, I don't see how it goes to the debtor's insolvency on the date of the transfer because the sale hadn't closed. We only need to look at March 2nd, 2000. The sale closed later. We're saying approximately March 10th, 2000. If there was such a waiver, it couldn't have occurred until the sale had closed. So on the date of the transfer, which is the only date we have to look at, March 2nd, they had this claim in all of the debtor's assets. Phillips has also argued that the compromise that occurred post-petition created the claim,  the claim arose in April of 1998, and the compromise, which couldn't create a pre-petition claim, only acknowledged a pre-petition reality. So on the date of transfer, on March 2nd, 2000, Duke had a minimum of $7 million in liabilities. And we know that the bankruptcy deficiency claim in this estate is at least $49 million. And that was established by the declaration of the estate representative, which can be found at tab 7, page 414. So the bank group had a lien on all of the assets, and its claim exceeded the value of those assets by $49 million. But, Your Honors, even a deficiency claim of $1 would have supported a finding of insolvency. On summary judgment, the court was to evaluate whether the evidence was sufficiently probative to create a genuine issue that could be resolved either way, or whether it is so one-sided that the one side must prevail as a matter of law. Would you address Mr. Wainer's claim that there seems to be some unholy conspiracy of allowing 11 creditors to have a different situation than the one creditor? Well, Your Honor, as I raised in our brief, what he's confusing is the priority scheme in each case or in the Bankruptcy Code, which provides for equality of treatment of creditors within a bankruptcy estate, not within the universe. It doesn't say that all creditors of all bankruptcy estates must be created, must be treated equally. There's just not an argument that has a foundation in law. And once again... It's each man for himself before we go into bankruptcy, but then everybody's treated equally once we're in bankruptcy. I didn't hear the first part of that. It's each man for himself or each woman for herself before we go into bankruptcy, but once in bankruptcy, there's equality of pain. Yes, according to the priority scheme that's set forth in the Bankruptcy Code. But as I recollect his representation, in his representation to us, if I understood it correctly, these were all equally situated people who had received preferences, and the bank forgave 11 but not the 12th. Your Honor, there is no evidence of that. We don't know what preference claims. First of all, once again, I believe Phillips is trying to litigate the administration of the bankruptcy case and not the issue of insolvency on the date of transfer. But I will say that there's no evidence of what, if any, preference actions, preference claims might have existed and were owned by those other estates. There's no evidence of that. That, I think, is more responsive to his representation than the other. That is to say, as I understood his representation, they were similarly or equally situated. There's no evidence of that. We don't know the assets. Well, I only have eight seconds left, but I would say as to those contribution claims, the alleged contribution claims, we don't even know if the contributors had any assets and whether those claims would have had any value. Okay. Thank you very much. Thank you very much. Your Honor, I would like to respond to some of the questions that you raised. I would just like, I think a lot of it is. Now, we're basically at the limit here. Why don't we give you two minutes so you can just get a sense of budgeting your time. Thank you, Your Honor. Okay. The order with the bankruptcy court approving the bank's claim says this. None of the debtors, any estate representative, any of their respective designees, any trustee appointed shall initiate, prosecute, or aid in the prosecution of any action to recover any non-Duke City preference recovery claim. That's 11 other entities. Not 11 creditors, Your Honor. 11 other entities creditors, hundreds, probably thousands of claimants made by any of the non-Duke City prior to the commencement of this case. Then it goes further. It says at page, Excerpt of the Record 7, page 462, the proceeds of any recovery of any Duke City preference recovery claim shall be allocated in accordance with the provisions of the bankruptcy code such that only general unsecured creditors direct claims against the Duke City debtors, not including any indebtedness of either Duke City debtor to the other. They all borrowed $60 million from the bank. Why is only this debtor in possession being stuck with that? Why is this debtor in possession not able to go after the 11 other debtors and say, Look, we all borrowed this money together. Give me some money back. And what I'm saying to you is if you look at that and you take the Certificate of Carlos De Matos, executed on March 10th, which is eight days after the transfer, this company was solvent. And Mr. De Matos is attesting to the fact that the collective entities are solvent, hence the scheme to create a preference. The collective entities are solvent, but here's what we do. What we do is we let 11 entities go, we create a $60 million claim, and then Phillips is there in court, and there's already an order that says, Well, that $60 million claim, you can't do anything about it. Am I complaining about the administration of this case? Absolutely. Has the administration of this case created a preference? Yes, it has. How did they do that? They did that by preventing me from looking at the balance sheet of all 11 entities and sticking this data with a $60 million claim. Okay. Thank you very much. Thank you. That's the last case on our argument calendar. Matthews to the Equipment Group versus Phillips is now submitted for decision. That completes the calendar for today, and we now stand in adjournment until tomorrow morning. Thank you. All rise. The court for discussion is adjourned. Thank you. Thank you.
judges: T.G. Nelson, W. Fletcher, Bea